# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ‖ | |
| Plaintiff, | ‖ | No. CR13-3003-MWB |
| vs. | ‖ | **REPORT AND RECOMMENDATION** |
| | ‖ | **ON MOTION TO SUPPRESS** |
| JAMES EDWARD POOLE, | ‖ | |
| Defendant. | ‖ | |

_____

Emily Dickinson said: "Dogs are better than human beings because they know but do not tell." While that may have been true in the Nineteenth Century, dogs today are not always so discreet. In this case, I am asked to consider whether a series of events, including an alleged alert by a canine trained to detect drugs, justified the warrantless search of a vehicle in which defendant James Poole had been a passenger.

## *Introduction*

Poole is charged by indictment (Doc. No. 3) with (a) conspiracy to distribute methamphetamine; (b) possession with intent to distribute methamphetamine; and (c) possession of a firearm in furtherance of drug trafficking. He has filed a motion (Doc. No. 24) to suppress evidence seized during a traffic stop. Plaintiff (the "Government") has resisted the motion (Doc. No. 33). The Trial Management Order (Doc. No. 10) assigns motions to suppress to me to conduct any necessary evidentiary hearings and to prepare reports on, and recommended dispositions of, those motions.

I held an evidentiary hearing on March 27, 2013, and April 3, 2013. Assistant United States Attorney Shawn Wehde appeared on behalf of the Government, while James Poole appeared personally and with his attorney, John Greer. The Government offered the testimony of Officer Michael Pruismann, Trooper David Saldivar, Special

Agent Bryant Strouse, Sergeant Jeffrey Hopkins (retired), Deputy Dallas Wingate and Sergeant Wendell Nope. Poole offered the testimony of Kyle Heyen. The following exhibits were admitted into evidence:

*Government Exhibit 1*: a DVD containing video of the traffic stop of Shannon Poole's vehicle on January 8, 2013.

*Government Exhibit 2:* a photograph of the left tail light of Shannon Poole's vehicle.

*Government Exhibit 3*: a traffic warning memorandum issued to Shannon Poole on January 8, 2013, to repair her taillight.

*Government Exhibit 4:* a copy of Iowa Code § 321.422 (2010).

*Government Exhibit 5:* certification for Dallas Wingate and Narcotic Detection Dog Bandit.

*Government Exhibit 6:* Wingate's handwritten training and deployment notes for Bandit dated November 20, 2012, to December 9, 2012.

*Government Exhibit 7*: Wingate's training records for Bandit for January 2013.

*Government Exhibit 8:* curriculum vitae of Sergeant Jeffrey Hopkins (retired) of Niagara Regional Police Service, Canine Unit.

*Government Exhibit 9*: Wendell Nope Expert Witness Resume Page.

*Government Exhibit 10:* a printout from http://www.schoolnet8.com listing measurements of high and low temperature, rainfall, peak gust and time of gust at schools around Iowa on January 8, 2013.

*Defense Exhibit 101:* curriculum vitae of Kyle Heyen.

*Defense Exhibit 102:* a list of cases in which Kyle Heyen has previously testified.

*Defense Exhibit 103:* a printout from http://www.wunderground.com showing hourly observations for weather including temperature and wind speeds in Webster City, Iowa, on January 8, 2013.

*Defense Exhibit 104:* a drawing by Kyle Heyen.

Both parties have submitted multiple briefs, including post-hearing briefs. The motion is now fully submitted.

## Summary of Evidence

### A.    The Traffic Stop

On January 8, 2013, at approximately 11:00 p.m., Trooper David Saldivar was traveling northbound on Iowa Highway 17 when he noticed a vehicle traveling southbound with a broken taillight. He testified that it was "showing white to the rear" and also appeared to be dim. He turned around, stopped the vehicle and approached the passenger side window. He requested insurance and driver's licenses from both occupants and noticed the driver had a "long lost look." He asked the driver, Shannon Poole, to come back to his vehicle. She agreed. James Poole, the defendant, waited in the passenger seat. While Shannon was in the patrol car, Officer Michael Pruismann with the Ellsworth/Jewell/Stanhope Police Department arrived and asked if Saldivar needed assistance. Saldivar asked Pruismann to run the driver's licenses and speak to James while he spoke to Shannon in his patrol car.

Shannon told Saldivar she was planning to get the broken taillight fixed in Des Moines. Saldivar asked where they had been that evening and she answered that they had been at a friend's house in Webster City. When Saldivar asked for the friend's name, Shannon was slow to respond, said she was just visiting friends, and upon further questioning eventually stated her friend's name was Sam. Shannon did not know where Sam lived in Webster City, just that she lived in an apartment. She said they were there "not that long." Shannon asked if she was going to get a ticket and

Saldivar told her "no," but he did issue her a warning or "fix-it ticket." *See* Government Ex. 3. This happened at approximately 11:08 p.m.[1]

Saldivar told Pruismann about Shannon's evasiveness in answering his questions. Pruismann then went to speak to James from the passenger side of the stopped vehicle. When he approached, he noticed James stuffing something into a plastic ashtray in the vehicle. James told Pruismann they had been at Jeremy's house in Webster City all day watching movies and had picked up fast food before heading back home to Boone. Saldivar and Pruismann then compared the stories they had received from the Pooles and noticed inconsistencies about where they had been, what they had been doing and how long they had been there.

Saldivar testified that he had concerns about whether Shannon was impaired. Back in the car, he asked her about marks or scabs on her arms that, based on his training, appeared consistent with drug use. She said she had been cut by a nail on a door. He then asked why she was shaking so much, referring to her hands. She said she was cold and they always shake like that. While it was cold and windy that night, Shannon was wearing a short-sleeved shirt with no jacket. Saldivar noted that Shannon's pupils appeared to be normal.

The insurance information initially provided to Saldivar was expired but Shannon said James had the valid insurance information in his billfold. Saldivar retrieved it from James and returned to his own vehicle. He then asked Shannon more questions about their activities that day. She was not sure what time they had left Boone to go to Webster City, but estimated it was around 8:00 p.m.

---

[1] Also at this time on the video, Saldivar exited his vehicle and Pruismann can be heard on the phone describing the color of the vehicle. Pruismann testified that during the stop, Deputy Rod Hicok called him and asked for the names and the type of car that had been stopped. Hicok then told Pruismann that during an intelligence meeting that morning the Pooles' names had come up as suspected drug traffickers. Pruismann gave this information to Saldivar, but it is unclear precisely when this occurred.

When Saldivar returned the insurance information to James he asked where they had been. James told him they had been at Jeremy's house. He reported that Jeremy's girlfriend's name is Sam. He said they stopped to get some food before driving back. Trooper Saldivar asked how long they had been at Jeremy's and James told him about an hour. He then elaborated on their activities that day.[2]

By this time, Pruismann had relayed to Saldivar the information from Hicok that the Pooles were mentioned during an intelligence meeting as possible drug traffickers. Pruismann asked Saldivar "Is she tweaking?" Saldivar said "it looked like it" and the two of them discussed bringing a canine to the scene. Saldivar asked Pruismann to find out where the nearest dog was located and said he would get a better look at Shannon when he was in the car. This happened at 11:21 p.m.

Back in the car, Saldivar asked Shannon more about how her taillight had been damaged. She explained it had happened about two to three weeks earlier when someone had borrowed her car and backed into something. Saldivar got out of the car, told an officer[3] "she's acting goofy" and said he was going to run her through some field sobriety tests. It turns out that the nearest available canine was in Boone County. Hicok called for the canine unit at 11:24 p.m.

When he returned to his car, Saldivar told Shannon that he wanted to explain why things were taking so long. He told her their stories were not matching up and he did not think a reasonable person would drive the distance from Boone to Webster City, stay for an hour and then come right back home. Shannon explained that her friend was fixing her computer and then they got food. When asked if she had had anything to drink or had taken any illegal narcotics, she answered "no." Saldivar requested that she submit to field sobriety tests and said if he did not see any indications he would have her back on the road as soon as possible.

---

[2] This part of the video recording is too muffled with background noise to hear James.

[3] Other officers, including Hicok, arrived as the stop was in progress.

He first performed a horizontal gaze test, which Shannon passed, but she had some difficulty with a different eye test. She then failed the Romberg test, having counted to 30 seconds in her head within 15 timed seconds. Saldivar exited the vehicle and spoke to another officer about the tests. That officer suggested Saldivar check her pulse and look in her nostrils.

Saldivar returned to his car and explained that he needed to perform two more tests because he was not sure whether the results indicated narcotics use or general nervousness. He noticed she was sweating profusely and when he asked why, she said she was hot. He pointed out that she said she was shaking earlier because she was cold. Shannon said she got hot when he turned on his heat and she warmed up quickly. Saldivar then asked to look in her nostrils and take her pulse. Her pulse was 124, which he told her was very high. Shannon stated that her pulse rate is usually high when she visits the doctor.

Saldivar spoke with another officer about the tests and described what he considered to be positive indications. He then returned to his car and asked Shannon when she had last used methamphetamine. She said she had never used anything, except that she had smoked marijuana when she was 15 or 16. When asked about any prescription medication she was taking, she listed three types taken for a compression fracture in her spine, muscle spasms and arthritis.

The canine, Bandit, and his handler, Deputy Dallas Wingate, arrived at approximately 11:50 p.m. Saldivar told Wingate that a traffic stop had taken place and that after talking to each of the occupants he believed narcotics were in the vehicle. He asked Wingate to deploy the canine. Before that happened, James was asked to leave the Poole vehicle and he exited from the passenger side. The doors of the vehicle were closed when Wingate approached it with Bandit.

Wingate began at the front passenger side of the vehicle and ran Bandit around the front, up the driver's side, around the rear and down the passenger side to the front of the vehicle. Wingate testified it was very windy that evening, estimating 20 to 30

mph from the west-northwest (blowing from the passenger side of the south-facing vehicle to the driver's side).[4]

During the first pass around the vehicle, Wingate noticed that Bandit's body posture, intensity and focus immediately changed while they were on the driver's side of the vehicle. Based on his experience with Bandit he believed the dog smelled narcotics on that side. He took Bandit around the vehicle several more times, each time observing that as they came around to the driver's side of the vehicle, Bandit's behavior changed. At one point, Bandit tried to crawl under the vehicle and then turned around trying to look up, which Wingate interpreted as meaning there was narcotics odor in that area. Bandit worked his way to the rear of the vehicle and alerted on the broken taillight of the vehicle by pawing on it, trying to bite it and then stepping back and barking at Wingate.[5]

At this point, Wingate told Pruismann the dog had alerted and both officers proceeded to the passenger side and deployed Bandit inside. When Bandit entered the vehicle, he stood on the floor by the passenger seat and leaned forward near the floor by the console. He took a deep breath and started biting and pawing at the console. Wingate said he recognized this as an alert to that area. He also noticed Bandit was standing on a purse with his front paws. He did not want the dog to disturb anything in the purse, so he moved Bandit to the driver's seat. Bandit then jumped in the back seat and Wingate saw him try to wedge himself down on the floor and squeeze under the

[4] There is some dispute as to the precise temperature and wind speed during the traffic stop. Defendant's Exhibit 103 shows that at 11:35 p.m. on January 8, 2013, the temperature in Webster City was 32 degrees with a west wind at 11.6 miles per hour. Government's Exhibit 10 is less clear, showing temperature ranges and peak wind gusts at various locations on January 8, 2013. While a location in Boone, Iowa, is circled, the peak wind gust is shown to have occurred at 12:01 a.m. on January 8, which would have been nearly 24 hours before the events at issue. Neither exhibit is particularly useful. In any event, the video of the traffic stop makes it very clear that a significant wind was blowing from right to left (passenger side to driver's side). At one point, papers placed on top of the car were blown onto the highway.

[5] Much of this behavior is obstructed on the video of the traffic stop because Wingate is standing between the patrol car camera and Bandit.

front passenger seat towards the spot where he had previously indicated. Wingate removed Bandit from the car and told Pruismann to look at the area in front of the passenger seat along the console.

Pruismann conducted an interior search of the vehicle in this area. When he picked up the purse, its magnetic flap flipped open and a glass pipe with white residue fell out. He also noticed there was a white plastic bag in the purse, which appeared to hold methamphetamine. James and Shannon Poole were placed under arrest and transported to the Hamilton County jail. Saldivar testified that Shannon was arrested for driving while impaired but the charge was later dismissed. Meanwhile, the vehicle was towed to the Hamilton County Sheriff's Office so it could be searched in a climate-controlled location. Warrants were obtained from a state court magistrate. Ultimately, methamphetamine and a stolen handgun were found.

As the traffic stop was concluding, Wingate told the others officers that Bandit is a better tracking dog than a drug dog. At the hearing, Wingate stated that he was simply advertising to the officers that Bandit was available to assist with tracking as well as drug detection.

## B. *Reliability of Bandit's Sniff*

Kyle Heyen testified as an expert for the defense. He is a private consultant and the owner of Detector Dogs International, Inc. He previously worked in law enforcement for 11 years. Heyen was trained and certified in all aspects of police dog detection under Utah standards, which are based on the German police methodologies and standards. His certification expired in 1996. Heyen has trained or certified approximately 500 dog teams, but stopped training in 2002. Heyen explained there are different standards for training and certifying dogs and handlers that come from different organizations around the United States and the world. To his knowledge, Iowa does not have its own set of standards. He testified law enforcement agencies typically train a dog team for 14 or 15 weeks, while a private company will train a dog

8

team in four weeks. In his experience, the certification process takes two days and requires the dog team to successfully complete a number of exercises. He does not believe experienced dogs are necessarily better at detecting than "rookie" dogs, so long as the dogs are given regular maintenance training.

Heyen testified that handlers should keep well-maintained records of maintenance training and deployments. Maintenance training should include work on all of the basic skills a dog and handler learn in training and should also simulate different situations and potential distractions they would encounter on the street. Heyen considers four hours per week the industry standard for maintenance training.

Heyen explained that when dogs locate an item they are trained to detect, they should display two responses. The first is an "alert," which is the dog's natural response that will never change. Each dog has its own unique alert such as wagging its tail, laying its ears back or tilting its head to one side. Heyen acknowledged that not all agencies use the term "alert" in this way. The second response a dog should display is an indication. This is the dog's trained response to let the handler know he has located the item he was trained to detect. It can be passive, meaning the dog will sit or lay down, or aggressive, meaning the dog will scratch, bite or bark. Heyen explained that a handler should recognize both responses because dogs can inadvertently become conditioned to always give an indication when deployed. Recognizing the alert helps prevent false indications.

Heyen testified a dog should be deployed around a vehicle once, to get acclimated, and a second time in a controlled manner with the dog performing a search pattern of sniffing up and down. Heyen does not believe it is appropriate to deviate from this pattern due to weather conditions, such as wind. If the dog alerts to an area, Heyen testified the dog should be given some time to work back to the source and give an indication. Heyen conceded that conditions at the scene could affect how long the dog would take to work back to the source or find the point of strongest odor. If the handler is unsure if the dog alerted to a specific area, Heyen stated that a "two-meter

rule" should be employed. To do this, the handler should proceed in the normal search pattern one meter past the area where the dog may have alerted, and then should circle around to one meter in front of that area and allow the dog to sniff through that area again in the normal search pattern.

Based on his review of the video of this traffic stop, Heyen testified that Wingate erred in several aspects of the deployment in this case. He stated the dog never focused or alerted to any specific area on the vehicle. He also noted that Wingate did not keep the dog close to the vehicle when making turns and that he stopped moving, which could cue the dog to indicate. Heyen did not see the dog alert or indicate the first two times he went around the vehicle. He noted that the dog did not seem to have any focus and that Wingate kept bringing the dog to the rear taillight on the driver's side. In his opinion, this behavior of stopping and watching the dog and bringing him to the same spot may have cued the dog to indicate in that spot. Heyen did not see the dog display an alert or natural response to narcotics odor at any time on the video.

Wingate testified about the dog's training and certification as well as his own. He has been with the Boone County Sheriff's Department for six years. He serves as a patrol sergeant, dispatch supervisor, canine officer, and drug recognition expert. He has been a canine officer since 2007 and began working with Bandit (his current canine) in October 2012. Wingate stated that he is currently certified by Sergeant Jeffrey Hopkins through the Halton Regional Police Service in Ontario, Canada, and was previously certified by the United States Police Canine Association (USPCA).

Bandit was trained by Hopkins, who had previously trained canines for the Boone County Sheriff's Department and the City of Boone while working for the Niagara Regional Police Service. Training for Bandit and Deputy Wingate took place from October 29, 2012, to November 23, 2012. Bandit was certified on November 17, 2012.

Hopkins testified that he worked for the Niagara Regional Police Service for 35 years where he helped develop canine programs for other police services and was

responsible for training and maintaining canine programs for 12 other police services in the United States and Canada. He also served as a private consultant developing and training detection dog teams and speaking about his work throughout Canada, the United States, and abroad. He was hired as a trainer and certifier by the Halton Regional Police Service when he retired from the Niagara Regional Police Service. Hopkins testified that there is no certification process in Ontario for his position, and that one becomes qualified to certify detection dog teams through training and experience. Basically, a trainer is certified by virtue of the fact that he or she trains dogs and handlers who are able to pass the necessary tests to become certified.

Hopkins testified he trained and certified Bandit and Wingate in October and November 2012. He testified that Bandit was trained to detect humans, articles, and narcotics, including methamphetamine. Like most drug dogs, Bandit was trained to locate the highest concentration of an odor that he has been trained to detect before indicating. Hopkins explained this was done through conditioning in which Bandit was rewarded only if he located the source of the odor, not just the scent itself. He explained that sometimes a dog will exhibit behavior that indicates he is trying to get to a higher concentration of the odor but is unable to do so because the source is unreachable to the dog. He stated that the dog will typically spend more time in the "odor comb" attempting to get closer to the source in this situation. Hopkins testified Bandit was trained to display an aggressive indication when he located an odor source meaning he will scratch, dig and bark. He also stated Bandit would alert that an odor was present by a change in his behavior and smelling pattern.

According to Hopkins, Bandit excelled in training. He stated "you only had to show him once" and Bandit's operative conditioning happened almost instantly. He also believed Wingate's experience with another dog enhanced Bandit's development. Wingate's and Bandit's success rate as a team during testing was one hundred percent. Hopkins stated "I can't think of a time this dog never succeeded at anything. It was

automatic.  He was that good."  He also testified that Bandit never falsely alerted during training.

Hopkins provided Wingate with directions for maintenance training.  He directed them to train at least twice a month and to be re-certified annually.  Wingate testified that he has followed Hopkins' instructions and that during training, Bandit has always found hidden narcotics with the exception of one instance when he missed a heroin hide.  According to Wingate, Bandit has never falsely alerted to the presence of narcotics.

Hopkins reviewed the video of the traffic stop.  He testified that the wind conditions are important because any odor exiting the car was being dispersed at a much higher rate.  He explained that under windy conditions, a dog might detect odor much further away from a vehicle than normal.  The dog could also be expected to need more time to determine the source of the odor.  Hopkins noted that Bandit spent most of the time on the driver's side of the vehicle and showed no interest in the passenger side, which could be explained by the direction of the wind.  He saw Bandit attempt to crawl under the car while on the driver's side.  He explained this is significant because it is contrary to a dog's natural behavior unless there is something of interest to the dog in that location, such as narcotics.  Hopkins also testified the broken taillight was significant because odor could escape through that fracture in the vehicle.

Hopkins also found it significant that the passenger door had been opened immediately before the dog sniff.  This allowed odor to leave the vehicle and it would take some time for any odor to accumulate inside the vehicle again.  He stated that this could explain why Bandit did not indicate immediately.  Hopkins testified that he did not see Wingate or Bandit do anything inappropriate based on their training.   He also stated that Bandit indicated when he barked at Wingate.

When asked about a dog's alert by defense counsel, Hopkins testified that he trains handlers to notice a change in the dog's body language, and the dog is trained to

give a "final alert." He said Bandit's final alert consists of scratching, barking, digging and biting. From what he could see on the video, he saw Bandit display a final alert when he barked at Wingate. Hopkins was not familiar with the two-meter rule described by Heyen.

Sergeant Wendell Nope also testified. He is a police dog instructor, trainer, evaluator and certifier with the state of Utah. He regularly trains and certifies dogs and handlers from other jurisdictions. Nope trained and certified Kyle Heyen in 1991. He believes dog handling is a perishable skill, which requires continued practice and remaining up-to-date on the trends and techniques in the field.

Nope testified that it is an overgeneralization to state that a dog should only pass around a vehicle two times during deployment, as this fails to take into account factors such as wind or passing vehicles. He stated that a dog will have greater difficulty locating the source of an odor when wind is present. When working back to the source, he testified it is optimal for the dog to indicate where the odor is exiting the vehicle because it gives the officers an idea of where to start the search.

Nope confirmed that different organizations use different training methodologies and have different standards. He also testified there is no uniform deployment method or search pattern and, instead, that it is up to the trainer and the team to come up with the method that works for them. He testified that there is no minimum number of hours required for maintenance training because it depends on the dog and the handler. He recommends four hours per week for the average team, but also knows teams that maintain their skills with four hours per month. He did not view the video and had no opinion about the deployment of the dog in this case.

## *Discussion*

Poole challenges every aspect of the traffic stop that led to the search of the vehicle. First, he argues there was no probable cause to stop the vehicle because Saldivar did not witness a traffic violation. Second, he argues the expansion of the

traffic stop was impermissible because Saldivar was simply stalling while waiting for the canine to arrive and had no reasonable suspicion of any criminal activity. Third, he argues the length of detention while waiting for the canine was unreasonable. Finally, he argues that the dog sniff was unreliable and did not establish probable cause to justify a search of the vehicle. For these reasons, Poole argues his Fourth Amendment right against unreasonable searches and seizures was violated. I will discuss each of Poole's arguments separately below.

### A.    *Validity of the Initial Stop*

Poole argues the initial stop was unlawful because Saldivar did not actually witness a traffic violation. "[I]t is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (quoting *United States v. Barry*, 98 F.3d 373, 376 (8th Cir. 1996)).

Iowa Code § 321.422 (2010) provides that "[n]o person shall display any color of light other than red on the rear of any vehicle, except that stop lights and directional signals may be red, yellow, or amber." Section 321.387 provides, "[e]very motor vehicle and every vehicle which is being drawn at the end of a train of vehicles shall be equipped with a lighted rear lamp or lamps, exhibiting a red light plainly visible from a distance of five hundred feet to the rear." Iowa Code § 321.387 (2010).

Poole relies on section 321.387 to argue Trooper Saldivar had no basis to stop the vehicle because he testified that both rear taillights were emitting mostly red light and he did not say he could not see the red lights from five hundred feet away. Poole also argues that Shannon complied with the law by applying red tape around the broken taillight until she could get it fixed. With regard to section 321.422, defendant suggests that "light" emitting from the rear taillight does not violate the statute because it is not a "color," as prohibited by the statute.

Saldivar testified he stopped Shannon's vehicle because it was "showing white to the rear" and the light was dim. He can be heard on the video of the traffic stop telling the Pooles the car was showing "white to the rear." He testified the taillight appeared damaged and red tape covered part of the light, but not all of it. There were holes in the tape and white light was showing from it when he stopped the vehicle.

I reject Poole's suggestion that light can be distinguished from white light or a "color of light" for purposes of the Iowa statutes. Whether "white" is a color or a combination of wave lengths, the Iowa Legislature has directed that the lights displayed on the rear of a vehicle must be "red, yellow, or amber" and that the lighted rear lamps must exhibit a "red" light. Iowa Code §§ 321.387, 321.422. Saldivar's testimony that he observed white light being emitted from the broken rear taillight is undisputed. No witness testified, based on his or her own observations, that the red tape covering the broken taillight prevented the display of any white light. Moreover, there is no alternative explanation in the record as to why Saldivar stopped the Poole vehicle. I find that Saldivar did see white light displayed by the vehicle's taillight and that this was a traffic violation, however minor, that created probable cause for the initial stop.[6] The stop was not illegal.

## B.    *Expansion of the Traffic Stop*

Even though the initial stop was lawful, it can become unconstitutional "if it is prolonged beyond the time reasonably required to complete" its purpose. *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "A reasonable investigation includes asking the driver for his license and registration, requesting the driver to sit in the patrol car to answer questions,

---

[6] I note that even if Saldivar had been mistaken as to what he saw (which the defendant did not prove), that would not have necessarily invalidated the stop. *See United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005) ("the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one.").

verifying the driver's identification and related documents, and asking questions about the driver's itinerary." *United States v. McCarty*, 612 F.3d 1020, 1024-25 (8th Cir. 2010) (citing *United States v. Ward*, 484 F.3d 1059, 1061-62 (8th Cir. 2007)). "An officer may also question a vehicle's passengers to verify information provided by the driver, and conflicting stories may provide justification to expand the scope of the stop and detain the occupants." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quoting *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) (citations omitted)). "Once an officer has decided to permit a routine traffic offender to depart with a ticket, a warning, or an all clear, the Fourth Amendment applies to limit any subsequent detention or search." *United States v. Alexander*, 448 F.3d 1014, 1016 (8th Cir. 2006).

"The scope of a traffic stop can be expanded if the driver's answers and behavior 'support suspicions unrelated to the traffic offense.'" *McCarty*, 612 F.3d at 1025 (quoting *Ward*, 484 F.3d at 1062). "If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband, he has 'justification for a greater intrusion unrelated to the traffic offense.'" *Lyons*, 486 F.3d at 371 (quoting *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994) (en banc)). "Reasonable suspicion requires 'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *United States v. Gill*, 513 F.3d 836, 844 (8th Cir. 2008) (quoting *United States v. Donnelly*, 475 F.3d 946, 952 (8th Cir. 2007)).

"Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience." *Id.* (quoting *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002)). Even though each factor might appear innocent on its own, a combination of factors may warrant further investigation when viewed together. *Linkous*, 285 F.3d at 720. "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are

uncovered." *Id.* (citing *United States v. Morgan*, 270 F.3d 625, 631 (8th Cir. 2001)). "A lawful traffic stop that is extended in order to execute a canine sniff does not become an unconstitutional seizure where the stop is reasonably prolonged and constitutes only *de minimis* intrusions on a defendant's liberty." *United States v. Mohamed*, 600 F.3d 1000, 1005 (8th Cir. 2010) (citing *Alexander*, 448 F.3d at 1016).

The Government argues Saldivar had reasonable suspicion to expand the scope of the traffic stop based on the following circumstances: (1) inconsistent stories provided by James and Shannon about their activities that day; (2) Shannon's difficulty in answering basic questions such as her friend's name and where her friend lived; (3) observations of Shannon's demeanor including shaking hands, profuse sweating, saying she was cold then hot and what seemed to be "track marks" on her arms, all of which led Saldivar to believe she may have been under the influence of a substance (4) intelligence that the Pooles may be involved in drug trafficking; and (5) positive indications of impairment from some of the drug recognition tests performed on Shannon by Saldivar.

Poole argues Saldivar did not have a reasonable suspicion to expand the traffic stop after he had processed the traffic violation. He suggests Saldivar was stalling while waiting for the canine and improperly "engaged in a 'blended process' of conducting a routine traffic stop and a drug interdiction investigation" as described in *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008). In *Peralez*, a van was pulled over for a license plate violation. The defendant waited in the passenger seat of the van while the driver spoke with the trooper in his patrol car. The trooper told the driver he was going to issue a warning for the license plate violation and then asked the driver if he would be willing to answer some additional questions. At this point, the trooper had no suspicion of any criminal activity. The driver agreed and the trooper asked questions related to drug trafficking and if his canine (who was in the back seat) would smell drugs when he walked him around the van. The trooper then approached the defendant in the van, asked for his identification and asked him similar drug-related

questions.  This occurred ten minutes after the driver was told he would only receive a warning.  While waiting for dispatch to check on the identifications, the trooper walked the drug dog around the vehicle.  The dog indicated and the trooper performed a search of the vehicle.

The court in *Peralez* found that the trooper had unconstitutionally extended the traffic stop by engaging in a "blended process" of conducting a routine traffic stop and drug interdiction investigation without consent or a reasonably articulable suspicion that criminal activity was afoot.  The off-topic questions more than doubled the time the driver was detained, and these questions prolonged the stop beyond the time reasonably required to complete its purpose.[7]

The circumstances of this traffic stop are distinguishable from those in *Peralez* because Saldivar's reasonable suspicion of criminal activity arose quickly, during routine questioning related to the reason for the stop.  *See United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008) ("If this routine investigation raises the officer's suspicions and the officer has reasonable, articulable suspicion, the officer may expand the scope of the investigation.").  Within the first few minutes of the stop, Saldivar observed that Shannon had a "long lost look" and told Pruismann that she was evasive in answering simple questions about where she had been, the name of her friend and where her friend lived.  *See United States v. Suitt*, 569 F.3d 867, 872 (8th Cir. 2009) (finding evasive and incomplete answers gave the officer reasonable suspicion to prolong the traffic stop for additional questioning.).  All of this occurred before he wrote the fix-it ticket.

Soon thereafter, Saldivar and Pruismann determined that the Pooles gave inconsistent stories while Saldivar continued to suspect impairment based on Shannon's demeanor.  *See Linkous*, 285 F.3d at 720 ("An officer's suspicion of criminal activity

---

[7] Ultimately, the court found suppression of the evidence was not warranted because the extension of the traffic stop was not a but-for cause of obtaining the evidence.  *See Peralez*, 526 F.3d at 1121-22.

may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered."). Saldivar's questioning does not represent the "blended process" described in *Peralez*, as his suspicion of criminal activity developed very early, while performing routine questioning associated with the initial traffic stop.

Based on the totality of the circumstances, I find that Saldivar had reasonable suspicion to expand the scope of the traffic stop to investigate whether the Pooles were transporting contraband. It was reasonable to ask Shannon questions about where she had been, what she had been doing there and how long she had stayed, as part of routine questioning. *See McCarty*, 612 F.3d at 1024-25 ("A reasonable investigation includes asking the driver for his license and registration, requesting the driver to sit in the patrol car to answer questions, verifying the driver's identification and related documents, and asking questions about the driver's itinerary."). It was also reasonable to ask Pruismann to obtain this information from James. *See Sanchez*, 417 F.3d at 975 ("An officer may also question a vehicle's passengers to verify information provided by the driver, and conflicting stories may provide justification to expand the scope of the stop and detain the occupants."). The video evidence and Saldivar's testimony demonstrate that he developed a reasonable suspicion early in the traffic stop based on Shannon's evasive answers and his observations of her demeanor. This suspicion only grew as more facts were uncovered.

Part of the delay in the traffic stop was due to the difficulty in obtaining valid insurance information. *See United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007) ("When there are complications in carrying out the traffic-related purposes of the stop . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine."). It was during this routine verification process that Saldivar (a) determined the Pooles had inconsistent stories about their activities that day,[8] (b)

---

[8] Although Poole argues the video indicates their stories did not conflict, Saldivar testified he believed there were conflicting stories, based on his conversation with Pruismann and the answers Shannon had given, and that this was only one factor giving rise to suspicion. *See*

19

observed further indicators of possible impairment and (c) received intelligence information that the Pooles were suspected of drug trafficking. These facts taken together with rational inferences added to the reasonable suspicion that criminal activity was afoot. Because Saldivar developed reasonable suspicion during the routine procedures of the traffic stop it was reasonable for him to expand the scope of the stop to investigate his suspicions of criminal activity.

Nor was the length of time that elapsed during the stop unconstitutional. "An investigatory stop supported by reasonable suspicion can become unlawful if it 'lasts for an unreasonably long time.'" *Gill*, 513 F.3d at 845 (quoting *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999)). "During an investigatory detention, an officer must . . . employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the stop." *Id.* (internal quotations omitted). "Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per se* time limit on all traffic stops." *Olivera-Mendez*, 484 F.3d at 510. "[U]nder the proper circumstances, we have considered delays for dog-sniffs far in excess of 90 minutes reasonable." *United States v. Riley*, 684 F.3d 758, 765 (8th Cir. 2012).

Saldivar requested a canine unit approximately 25 minutes into the stop. The stop occurred in Hamilton County while Wingate and Bandit were in Boone County, the next county south. Wingate arrived at the scene approximately 27 minutes later. This delay was reasonable under the circumstances. *See United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) (eighty minute detention was not unreasonable while awaiting the arrival of a drug dog where the officer "acted diligently to obtain the dog,

---

*Linkous*, 285 F.3d at 720 ("Even though each factor might appear innocent on its own, a combination of factors may warrant further investigation when viewed together."); *United States v. Lebrun*, 261 F.3d 731, 733 (8th Cir. 2001) (stating that a court should consider the "view [of] the totality of the circumstances through the perspective of an experienced law enforcement officer trained in crime detection and acquainted with the behavior of criminals.").

and the delay was caused only by the remote location of the closest available dog."). In short, neither the decision to expand the stop nor the resulting delay violated Poole's constitutional rights.

## C.    *Search of the Vehicle*

### 1.    *Automobile Exception*

The Fourth Amendment protects persons against unreasonable searches and seizures. U.S. Const. amend. IV. Warrantless searches are *per se* unreasonable, with a few well-established exceptions. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005). "The so-called 'automobile exception' permits police to conduct a warrantless search of an automobile if, at the time of the search, they have probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* at 1140-41. "[A]n alert or indication by a properly trained and reliable drug dog provides probable cause for the arrest and search of a person or for the search of a vehicle." *United States v. Winters*, 600 F.3d 963, 967 (8th Cir. 2010). Poole challenges the search of the vehicle by arguing the drug dog sniff was unreliable for various reasons.

### 2.    *Reliability of the Drug Dog Sniff*

#### a.    *Is This Issue Properly Before Me?*

Poole's original brief, filed contemporaneously with his motion to suppress, contained two arguments: (1) the initial stop was improper and (2) Saldivar did not have reasonable suspicion to justify the extension of that stop. Doc. No. 24-1 at 2-3. Nothing in the motion or brief indicated that Poole also intended to attack the outcome of the drug dog's open air sniff on grounds that the dog was unreliable, the dog did not actually alert to the presence of narcotics, or the handler did not conduct the procedure properly. This lack of notice was so clear that the Government did not believe it necessary to call Wingate as a witness during the March 27, 2013, hearing.

At that hearing, however, Poole's counsel stated that Poole does dispute the validity of the dog-sniff procedure that took place during the traffic stop. In other words, he not only objects to the stop and the extension of the stop, but also contends that the result of the open air sniff did not establish probable cause to justify a search of the vehicle. Poole offered testimony of his expert, Kyle Heyen, on the issues of whether Bandit is reliable and, if so, whether Wingate deployed him properly.

The Government objected to Poole's attack on the sniff results, pointing out that Poole had not addressed the issue in his motion papers. Poole's counsel argued that the motion and brief did, in fact, raise these issues, but making that argument required him to verbally cut and paste words and phrases from the actual documents into new sentences. Even then, no reasonable reader could glean from those documents an attack on the outcome of the open air sniff.

While it would have been within my discretion to find that Poole waived any attack on the sniff results, I chose not to do so. Instead, I allowed Heyen to testify and advised counsel that the hearing would then adjourn until a later date. Heyen's testimony began on March 27 and resumed when the hearing re-convened on April 3. This delay gave the Government time to arrange for Wingate to testify in person and for Hopkins and Nope to testify by telephone. I also allowed additional briefing to permit both parties to submit written arguments on all issues, including Poole's attack on the validity of the sniff. Thus, while I understand the Government's objection, and agree that Poole failed to contest the validity of Bandit's deployment in his initial moving papers, I find that the resulting prejudice to the Government has been cured. Poole's attack on the validity of the sniff is ripe for consideration.

### b. The Merits Of The Issue

A dog sniff of the exterior of a vehicle during a lawful traffic stop does not violate the Fourth Amendment. *United States v. Rivera*, 570 F.3d 1009, 1012 (8th Cir. 2009) (citing *Caballes*, 543 U.S. at 409-10). "A dog's positive indication alone is

enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999). A drug dog is considered reliable when it has been "trained and certified to detect drugs." *Olivera-Mendez*, 484 F.3d at 512. "The standard is no more demanding where police search an automobile based on probable cause without a warrant." *Id.* However, the court must also consider evidence which may detract from the dog's reliability. *See Winters*, 600 F.3d at 967 ("Contrary evidence 'that may detract from the reliability of the dog's performance properly goes to the credibility of the dog.'") (quoting *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994)). The relevant question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013).

Here, the Government submitted sufficient evidence that the drug dog sniff at issue was reliable. Wingate and Bandit were trained and certified by Hopkins.[9] Hopkins' testimony and curriculum vitae (Government Exhibit 8) establish that he is qualified to train dog and handler teams. Indeed, there is no basis in the record to argue otherwise.

Hopkins' testimony also establishes that Bandit, as handled by Wingate, is properly trained and qualified to detect methamphetamine. Indeed, Hopkins raved about the team. He testified that Bandit's operative conditioning happened almost instantly and that Wingate enhanced the dog's development based on his previous experience with another canine. In discussing Bandit, Hopkins stated: "He was automatic. He was that good." He also testified that Wingate's and Bandit's success rate as a team during training was one hundred percent.

Wingate further confirmed Bandit's reliability, stating that Bandit has only missed one heroin hide in his subsequent trainings and has never falsely alerted. There

---

[9] All experts indicated there are no uniform standards or tests a dog and its handler must complete to become "certified" in narcotics detection.

is no evidence that Wingate, whether with Bandit or his previous dog, has ever been involved with a false alert during a deployment.

As for Wingate's deployment of Bandit during this traffic stop, Hopkins testified that he reviewed the video and saw no inappropriate handling or behavior inconsistent with the training he had provided. Wingate explained that he turned the corners of the vehicle in the way he was trained. He also testified it is not unusual to circle a vehicle more than two times, especially in windy conditions. He testified that he stopped to allow Bandit to sniff on the driver's side of the vehicle because he noticed the dog's behavior change in this area, which suggested to him that Bandit had smelled narcotics and was attempting to locate the area of strongest odor. Specifically, he observed Bandit's body posture, intensity and focus change in this area and that Bandit had also tried to get underneath the car. He testified that Bandit indicated to the odor of narcotics in the way he had been trained by pawing on the taillight, biting at it and then barking. He displayed this same behavior when he was deployed inside the vehicle.

Poole relies on his expert, Kyle Heyen, to argue that Wingate committed errors while deploying Bandit and that Bandit did not genuinely indicate to the presence of drugs. Heyen testified, based on his review of the video, that Wingate erred in the following ways: 1) allowing the dog to go past the corners of the vehicle instead of keeping him close to the vehicle, 2) circling the vehicle more than two times, 3) stopping and watching the dog, 4) letting the dog wander in no particular pattern on the driver's side of the vehicle, and 5) failing to identify the dog's alert before he indicated. I find that this testimony does not establish that Bandit's alert, as interpreted and reported by Wingate, was unreliable.

First, Heyen (like the other experts) acknowledged that different trainers and certifiers prefer different methods of deployment. There are no uniform, accepted standards of how an open air sniff should be conducted. While I have no reason to doubt that Heyen prefers the method he described, and finds it to be reliable, his preference does not establish that other methods are thereby unreliable. Indeed, Heyen

noted that he was trained by Nope and made it clear that he considers Nope to be an expert in the field, yet Nope's testimony as to deployment techniques did not match Heyen's.

Second, Heyen's testimony about the deployment in this case was based entirely on his review of the video. Unfortunately, Bandit's actions are blocked at various times by Wingate and/or the vehicle. Thus, Heyen's testimony that he did not see certain behavior by Bandit does not conclusively establish that no such behavior occurred. Indeed, at a key moment when Bandit was allegedly alerting to the broken taillight, Wingate was standing between Bandit and the patrol car's camera. While Heyen can testify about what he observed or did not observe on the video, the video does not capture all of the relevant events. Those at the scene, such as Wingate, are in a better position to describe Bandit's actions.[10]

Third, and relatedly, Heyen has never worked with Wingate or Bandit. Thus, while he may believe that nothing in the video appears to be an alert or indication by Bandit to the presence of narcotics, Hopkins – who actually trained Wingate and Bandit – testified that the video does show that Bandit alerted. And, of course, Wingate himself provided sworn testimony concerning Bandit's actions and Wingate's interpretation of those actions.

I find that Heyen's opinion testimony does not overcome the Government's evidence (a) that Bandit and Wingate are a certified and reliable drug-detection team, (b) that Wingate deployed Bandit in a reliable manner, (c) that Bandit alerted Wingate to the odor of narcotics during the open air sniff and (d) that Wingate so advised the other law enforcement officers at the scene. As noted above, the relevant question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Florida,* 133 S. Ct. at 1058. Based on the

---

[10] Heyen did his credibility no favor by refusing to acknowledge, on cross-examination, that Wingate's body blocked a large part of the relevant view at a key moment.

evidence presented, the Government has established this proposition. As such, I reject Poole's argument that Bandit's deployment in this case failed to establish probable cause to search the vehicle.

## Conclusion

For the foregoing reasons, I find that the evidence recovered from the vehicle should not be suppressed and RESPECTFULLY RECOMMEND that Poole's motion to suppress (Doc. No. 24) be **denied**. Objections to this Report and Recommendation must be filed by **May 2, 2013.** Responses to objections must be filed by **May 16, 2013.**

IMPORTANT NOTE: Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **April 25, 2013**, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 18th day of April, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA